# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARY LASSEIGNE** | **CIVIL ACTION** |
| **VERSUS** | **No. 16-16925** |
| **STERLING JEWELERS, INC.** | **SECTION I** |

## ORDER AND REASONS

Before the Court is the defendant's motion[1] to dismiss or to compel arbitration. The Court held two evidentiary hearings in connection with the motion. Having now considered the evidence adduced at those hearings, as well as the appropriate standard of law, the Court grants the motion and compels arbitration.

## I.

Mary Lasseigne is a Caucasian female. She was hired as a sales associate by Sterling Jewelers, Inc. d/b/a Jared the Galleria of Jewelry ("Sterling") in February 2014. Lasseigne worked for Sterling until June 2015, when she claims that she was constructively discharged due to her race. According to the complaint, Lasseigne's manager Latoya Washington—an African-American female—discriminated against white employees like Lasseigne, habitually speaking to them in a demeaning manner and affording preferential treatment to black employees. Although Lasseigne allegedly complained repeatedly about the discrimination to her district manager and to human resources, she alleges that nothing was ever done to address the problem.

---

[1] R. Doc. No. 7.

Lasseigne filed a charge of discrimination with the Equal Employment Opportunity Commission after she left Sterling. In July 2016, the EEOC found Lasseigne's claims of racial discrimination against Washington and Sterling to be substantiated. On September 13, 2016, Lasseigne received a right-to-sue letter. She filed this lawsuit on December 7, 2016, alleging that Sterling's actions violated Title VII, 42 U.S.C. § 1981 and Louisiana state law.

Sterling immediately filed the present motion to dismiss or stay and compel arbitration pursuant to its employment agreement with Lasseigne. Sterling argues that upon being hired, all of its employees—including Lasseigne—must sign an agreement to resolve employment-related disputes through the "RESOLVE Program."

According to Sterling, the RESOLVE Program is a three-step alternative dispute resolution program with the final step being mandatory arbitration. On their first day of work, new Sterling employees log into Sterling's human resources system and begin an electronic onboarding process. The process requires the employees to access a number of mandatory screens addressing various human resources topics. Among the subjects the employee must review is Sterling's RESOLVE Program. The employee clicks on a link which opens a page summarizing the RESOLVE Program agreement. The page instructs the employee to "click the following link to review the RESOLVE Program" agreement in its entirety. *See* R. Doc. No. 7-3, at 4. At the bottom of the page, the employee must enter her electronic signature signifying that "I acknowledge that I have read, understand, and agree to the terms and conditions

established in the RESOLVE Program Arbitration Agreement." *See* R. Doc. No. 7-3, at 4. The employee may not proceed past that point in the onboarding process until he or she reviews the RESOLVE Program and clicks on the link signifying the employee's agreement to it.

In support of its motion, Sterling submitted computer records evidencing Lasseigne's electronic signature agreeing to the terms and conditions of the RESOLVE Program. The records show that Lasseigne's electronic signature was provided at 2:47pm on February 24, 2014—Lasseigne's first day of work. Sterling explained that an employee's electronic signature cannot be entered without first entering a personal code which only the employee knows. The computer records the amount of time spent at each step of the onboarding process. According to the records, Lasseigne spent thirty seconds on the page displaying the RESOLVE Program agreement.

In a declaration attached to her opposition, Lasseigne claimed that she "never completed the computer portion of my orientation" because her "login procedure was ineffective." *See* R. Doc. No. 12-2. She instead asserted that "Keenan Goldsmith, the general manager of my store, actually completed the computer portion of my initial employee processing." *See* R. Doc. No. 12-2. Lasseigne also submitted declarations from other former Sterling sales associates—and an assistant general manager—in which they claimed never to have been made aware of the RESOLVE Program and not to have knowingly agreed to participate in the RESOLVE Program. She argued

3

that she could not be forced to participate in the Program because she did not sign the agreement and she was never made aware of the Program.

## II.

The Court held two evidentiary hearings. In addition to testifying herself at the hearings, Lasseigne called to testify each of the former Sterling employees who had submitted declarations in support of her opposition. At the Court's direction, Keenan Goldsmith, the general manager who guided Lasseigne through the electronic onboarding process, was called to testify. The only witness called by Sterling was Jamie Broadhead, the Director of Human Resources for Sterling.

Each of the former Sterling employees called to testify by Lasseigne—Thomas Mancil, Shana Johnson, George Peralta, and Patsy LaRive—did not remember the RESOLVE Program. However, when confronted with their signatures, none of the witnesses denied that they had signed the arbitration agreement. Neither did any of the witnesses deny that they had been afforded an opportunity to read all of the documents with which they were presented during the onboarding process.[2]

---

[2] An exchange with Lasseigne's first witness, Thomas Mancil, is representative. *See* R. Doc. No. 21, at 15:9-24:11:

| | |
|---|---|
| Q. | So you agree that you – you don't dispute that you agreed to participate in the RESOLVE Program, correct? |
| A. | I cannot argue that. I'd have to agree, it has my signature on it. |
| . . . | |
| THE COURT: | As you testify here today, you cannot testify as to what you remember seeing exactly or not with respect to all of the documents that were on this onboarding process; is that right? |
| THE WITNESS: | That is correct. |

Lasseigne testified that her memory of the onboarding process as a whole was not sharp, though she was certain that she and Mr. Goldsmith switched chairs at least once at the beginning of the onboarding process in order to allow him to fix a computer problem.³ Although Lasseigne was initially adamant that she neither saw nor signed the RESOLVE agreement during her onboarding process, her subsequent testimony revealed that Lasseigne did not remember many of the documents with which she was presented during the onboarding process.⁴ When Lasseigne was

---

| THE COURT: | Okay. However, you're not denying that you visualized it and had a chance to read the documents that were part of the onboarding process at the time that you electronically signed the documents; is that correct? |
| --- | --- |
| THE WITNESS: | That's correct, your Honor. |

³ *See* R. Doc. No. 21, at 45:2-45:13:

| THE COURT: | I am getting the impression, correct me if I am wrong whether this is a fair statement or not, that you remember there was a problem logging in, right? |
| --- | --- |
| THE WITNESS: | Right. |
| THE COURT: | You remember giving -- is it Keenan? |
| THE WITNESS: | Keenan Goldsmith. |
| THE COURT: | -- your Social Security number, correct? |
| THE WITNESS: | Yes, your Honor. |
| THE COURT: | Okay. But with respect to the rest of the process, it appears to me, correct me if I am wrong, that your recollection is foggy about it; is that a fair statement? |
| THE WITNESS: | Yes. Yes. |

⁴ *See* R. Doc. No. 21, at 51:6-51:23:

| THE COURT: | Do you remember seeing the Statement of Standards of Conduct and Business Ethics, which is No. 1 on that, on this form dated February 24th, 2014? Do you remember seeing that? |
| --- | --- |
| THE WITNESS: | No, I do not. |

5

questioned about the sworn statement she had submitted in connection with her opposition, she admitted that several of the assertions in the statement—which was not prepared by Lasseigne but rather by her counsel—were not entirely accurate. She admitted, for example, that the declaration's statement that "During my onboarding process I never completed the computer portion of my orientation," was not true.[5] She also clarified that although her declaration stated that "Keenan Goldsmith, the general manager of my store, actually completed the computer portion of my initial employee processing," what she meant was that Mr. Goldsmith used the computer at some point during the beginning of her onboarding process.[6] Lasseigne conceded that she had completed at least part of the computer portion.[7]

Ultimately, Lasseigne simply could not remember those portions of the electronic onboarding process in which Mr. Goldsmith may have participated.[8] She

---

| | |
|---|---|
| THE COURT: | Do you remember seeing the Field Acknowledgment of the Team Member Training? |
| THE WITNESS: | I can't say. |
| THE COURT: | Do you remember seeing the Information Security Policy and Acknowledgement? |
| THE WITNESS: | I want to say No. 4, maybe, the security policy. |
| THE COURT: | So you might have seen that? |
| THE WITNESS: | Yes. |
| THE COURT: | Do you remember seeing No. 5 the EPR non CA, WV, CT, NY Employee Purchases Reimbursement? Do you remember seeing that while you were going through the process? |
| THE WITNESS: | No. |

[5] *See* R. Doc. No. 21, at 56:15-56:19.
[6] *See* R. Doc. No. 21, at 55:12-55:21.
[7] *See* R. Doc. No. 21, at 55:22-56:21.
[8] *See* R. Doc. No. 21, at 57:8-58:2:

was certain, however, that Mr. Goldsmith never instructed her not to read certain documents during the onboarding process and that Mr. Goldsmith never shielded any documents from her view during the process.[9]

Mr. Goldsmith, although he was unable to remember conducting the onboarding with Lasseigne specifically, was able to elucidate why it may have been necessary for him to use the computer during Lasseigne's electronic onboarding process. He testified:

| | |
|---|---|
| THE COURT: | So was he active in providing information during this onboarding process to anything other than the login procedure, other than the login to the computer? |
| THE WITNESS: | I know I keep going around, I'm sorry, I don't remember. I'm just - I know he asked me my Social Security and stuff like that, that's the only thing I can remember . . . . |
| THE COURT: | So [is] it a fair statement that you cannot testify with any certainty that Keenan did anything to input information into the computer other than with the login, other than with the login information, you can't say after that what he put in or what he didn't put in? |
| THE WITNESS: | No. |
| THE COURT: | Am I correct about that? |
| THE WITNESS: | Yes. Yes, your Honor. |
| THE COURT: | Okay. |

---

[9] *See* R. Doc. No. 21, at 50:1-50:9:

| | |
|---|---|
| THE COURT: | Did Keenan ever instruct you not to read any documents during this onboarding process? |
| THE WITNESS: | Did he ever instruct me – |
| THE COURT: | Tell you not to read certain documents? |
| THE WITNESS: | No. |
| THE COURT: | To your knowledge, did he ever shield any of the documents in that onboarding process from you so that you could not see them? |
| THE WITNESS: | Not that I am aware of. |

7

> Q. Okay. Do you remember the -- do you remember anything about Mary Lasseigne's on-boarding process at all?
> A. No. I remember I did it, but I don't remember all the specifics of it.
> Q. Do you remember there being any issue with the logging-in procedure with respect to Mary?
> A. Not specifically with respect to her. But I can say with the new on-boarding process that we had with the computer system, we would get kicked off a lot. There were several passwords that you had to put in, so a lot of times you'd have to stop to go and get the information that you needed password-wise and come back to fill in the information.

R. Doc. No. 20, at 6:12-6:23. Later, when confronted with the question of whether he might sometimes enter information during an employee's onboarding process which was supposed to be entered by the employee, Mr. Goldsmith testified:

> Q. And you didn't complete any portion of the on-boarding other than what you were required to complete, that being the I-9 and then the payroll information?
> A. Correct.
> Q. So you wouldn't go through and acknowledge any policies that were presented to the new employee during the on-boarding process?
> A. No. That would be a big no-no.
>
>> THE COURT: Let me ask you something. Let me get to the meat of this, if I can. In your entire career as a general manager -- this is Judge Africk. [Mr. Goldsmith testified by telephone at the agreement of the parties].
>> THE WITNESS: Yes, sir.
>> THE COURT: -- a general manager at Jared, did you ever electronically sign a new hire's name to a document on the computer during the on-boarding process?
>> THE WITNESS: No, sir. That would be against company policy.
>> THE COURT: And did you ever complete any portion of the on-boarding process which was required to be completed by the applicant?
>> THE WITNESS: No.

R. Doc. No. 20, at 13:23-14:19.[10]

With respect to the final witness, Sterling's HR representative Jamie Broadhead, nothing material was established outside of that which had already been submitted to the Court in connection with the briefs.

### III.

### A.

The Federal Arbitration Act ("FAA") provides that federal courts shall enforce arbitration agreements. *See* 9 U.S.C. §§ 3-4. The FAA "calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses." *Bell v. Koch Foods of Mississippi, LLC*, 358 F. App'x 498, 500 (5th Cir. 2009) (internal quotation marks omitted). "It was Congress's clear intent, in the FAA, to move the parties to

---

[10] At one point, Mr. Goldsmith was questioned as to whether employees were asked to sign documents during the onboarding process without being afforded an opportunity to read them:

> THE COURT: Would you ever tell an employee to sign a document without allowing the employee to read it?
> THE WITNESS: Umm, geez . . . Honestly, it's been so long ago, I don't know. I just know that the process was lengthy and there were times that we had to expedite it but make sure that things were signed.

R. Doc. No. 20, at 19:8-19:13. Mr. Goldsmith also testified, however, that he would never electronically sign a document which was required to be signed by the employee. *See, e.g.*, R. Doc. 20, at 19:5-19:7. Further, Lasseigne specifically testified that Mr. Goldsmith never instructed her to sign a document without providing her an opportunity to read it. *See* R. Doc. No. 21, at 50:1-50:9. Accordingly, having reviewed all of Mr. Goldsmith's testimony and having placed it in context with all of the testimony at the evidentiary hearings, the Court specifically finds that the credible evidence is that Lasseigne was afforded an opportunity to read the RESOLVE Program agreement without interference by Mr. Goldsmith.

9

an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Id.* at 500-501 (internal quotation marks omitted).

Because arbitration is a matter of contract between the parties, a court cannot compel a party to arbitrate unless the court determines that the parties agreed to arbitrate. *See Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1064 (5th Cir. 1998). As such, courts conduct a bifurcated inquiry to determine whether parties should be compelled to arbitrate a dispute. *Washington Mut. Finance Group, LLC v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004). First, the court determines whether the parties agreed to arbitrate the particular type of dispute at issue. *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012). If so, the court next determines whether any applicable federal statute or policy renders the claims nonarbitrable. *Dealer Computer Servs. v. Old Colony Motors, Inc.*, 588 F.3d 884, 886 (5th Cir. 2009). As no party argues that a federal statute or policy renders the claim nonarbitrable, the analysis begins and ends with the first step of the inquiry.

To determine whether the parties have agreed to arbitrate a particular claim, this Court considers: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 598 (5th Cir. 2007) (internal quotation marks omitted). Lasseigne does not argue that this dispute falls outside of the arbitration provision if it is valid. The question is simply whether there is a valid agreement to arbitrate. As to that question, the Supreme Court has made clear that unless the parties "clearly and unmistakably"

provide that the arbitrator should answer it, the "question of arbitrability" is "an issue for judicial determination." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

To obtain an evidentiary hearing on the validity of the arbitration agreement, a plaintiff must make at least "some showing that under prevailing law" she would be relieved of her contractual obligation to arbitrate if her allegations prove to be true, and she must produce "some evidence" to substantiate her factual allegations. *See Am. Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 710 (5th Cir. 2002); *see also Chester v. DirecTV, L.L.C.*, 607 F. App'x 362, 365 (5th Cir. 2015). Although the Court was skeptical that Lasseigne had met that standard, the Court nevertheless decided that a hearing was appropriate given Lasseigne's sworn declaration. After hearing the evidence adduced at the evidentiary hearing and Lasseigne's abandonment of material portions of her declaration, the Court concludes that the arbitration provision is valid and enforceable.

**B.**

When determining whether the parties entered into a valid agreement to arbitrate, federal courts use ordinary state law contract principles. *Precision Builders, Inc. v. Olympic Grp., L.L.C.*, 642 F. App'x 395, 400 n.5 (5th Cir. 2016). Both parties agree that Louisiana law applies. Both parties also agree on the relevant aspects of Louisiana contract law. Suffice it to say, under Louisiana law a contract is not formed unless there is a meeting of the minds of the parties through offer and acceptance. *See* La. Civ. Code art. 1927.

More to the point, under Louisiana law "[i]t is well settled that a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain it to him." *Aguillard v. Auction Mgmt. Corp.*, 908 So. 2d 1, 17 (La. 2005). Under the Louisiana Uniform Electronic Transactions Act, "[a]n electronic record or electronic signature is attributable to a person if it was the act of the person" and "[t]he act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." La. R.S. § 9:2609(A)(1) and (2). The Act further states that the effect of an "electronic signature attributed to a person . . . is determined from the context and surrounding circumstances at the time of its creation." La. R.S. § 9:2609(B).

Sterling submits evidence of Lasseigne's electronic signature on the RESOLVE Program agreement, as well as evidence corroborating that it was Lasseigne herself who signed the agreement. Lasseigne insists she did not electronically sign the arbitration provision.

Under the Fifth Circuit's standard, if Lasseigne places the making of the arbitration agreement "in issue," as that phrase has been construed, then Sterling must prove the validity of the arbitration agreement by a preponderance of the evidence. *See Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012). To put the making of the arbitration agreement "in issue," the plaintiff is "required to unequivocally deny that [she] agreed to arbitrate and produce some evidence

supporting [her] position." *Chester*, 607 F. App'x at 363-364 (internal quotation marks omitted). Because the plaintiff in *Chester* "unequivocally denied" making the arbitration agreement and "produced an affidavit" stating as much, the Fifth Circuit held that the making of the arbitration agreement was "in issue." *Id.* at 365 (citing 9 U.S.C. § 4).

Assuming that Lasseigne can be considered to have placed the making of the arbitration agreement in issue, the context and surrounding circumstances at the time of the electronic signature demonstrate by a preponderance of the evidence that the signature on the arbitration agreement is attributable to Lasseigne. *See* La. R.S. § 9:2609. The Court does not find Lasseigne's claim that she did not electronically sign the arbitration provision to be credible. The evidentiary hearings established that Lasseigne could not remember which documents she was presented with and which documents she signed during her onboarding process. Although Lasseigne suggested in her sworn statement that Mr. Goldsmith completed the entire computer portion of her onboarding process, she backpedaled from that statement on the witness stand. Ultimately, the only point on which Lasseigne was consistent in her testimony was her statement that Mr. Goldsmith asked her for her social security number towards the beginning of the electronic onboarding process, and then briefly switched places with her to work on the computer.

The reason for such a switch was clarified by Mr. Goldsmith, who explained that he often had to change positions with new employees during the onboarding process in order to log in for the employee after a computer malfunction. Critically,

13

Mr. Goldsmith was explicit that he never used such opportunities to enter information which was supposed to be entered by the new employee. The Court found his testimony on these points to be credible, especially noting that Mr. Goldsmith no longer works for Sterling.

The testimony of Lasseigne's other witnesses also militated against her position. In response to their sworn declarations that they did not sign the RESOLVE arbitration agreement, Sterling produced copies of the agreement signed by each of the witnesses whose testimony Lasseigne relies on. When confronted with their signatures at the hearing, none of Lasseigne's witnesses denied their authenticity. Similarly, no witness for the plaintiff denied being afforded an opportunity to review the documents which they signed during the onboarding process. The Court found their testimony to be credible.

All of the evidence in the record apart from Lasseigne's own self-serving declaration weighs in favor of the conclusion that Lasseigne's electronic signature should be attributed to her. At the evidentiary hearing, Lasseigne admitted that her statements in the declaration were exaggerated. *See* R. Doc. No. 21, at 55:12-55:21. Considering all of the evidence, the Court concludes that Lasseigne's vague recollection of the onboarding process cannot overcome the testimony of the other witnesses or the documentary evidence. The totality of the circumstances demonstrate that it is more likely than not that Lasseigne electronically signed the RESOLVE Program agreement and that Lasseigne was afforded an opportunity to review the agreement before she signed it.

The only remaining question is whether to dismiss Lasseigne's claims or stay the case pending the conclusion of the arbitration proceedings. Fifth Circuit precedent makes clear that the latter option is the better one. *See Ruiz v. Donahoe*, 784 F.3d 247, 249 (5th Cir. 2015) (observing that "the proper course of action is usually to stay the proceedings pending arbitration"); *Pacheco v. PCM Const. Servs., L.L.C.*, 602 F. App'x 945, 949 n.2 (5th Cir. 2015) (recognizing that dismissal of an action pendant to a motion to compel arbitration "may be a debatable procedure").

## IV.

For the foregoing reasons,

**IT IS ORDERED** that the motion to compel is **GRANTED**, that arbitration pursuant to the RESOLVE Program is compelled, and that the above-captioned matter is **STAYED AND ADMINISTRATIVELY CLOSED** pending arbitration. Any party may file a written motion to re-open the above-captioned case within **thirty days** after final resolution of the arbitration proceeding.

New Orleans, Louisiana, May 5, 2017.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**